## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

KURYAKYN HOLDINGS, LLC,

       PLAINTIFF,

       V.

CIRO, LLC, THOMAS RUDD, KEN MADDEN, DARRON MAY, AND CHRISTOPHER LINDLOFF,

       DEFENDANTS.

CIVIL ACTION NO. 3:15-CV-703

JURY TRIAL DEMANDED

### DECLARATION OF HOLGER MOHR

I, Holger Mohr, do hereby declare as follows:

1.      I have personal knowledge of the matters set forth in this Declaration. If called upon to do so, I could competently testify as to these matters.

2.      I am employed by Kuryakyn Holdings, LLC ("Kuryakyn") and serve as its President. I have had this position since January 6, 2014.

3.      Prior to becoming Kuryakyn's President, I worked at its parent company, Motorsport Aftermarket Group, Inc. ("MAG"), as Vice President of Business Development. I started working for MAG in May 2012.

4.      Kuryakyn is a Somerset, Wisconsin-based supplier of motorcycle parts and accessories.

5.      Kuryakyn designs, markets, distributes, and sells aftermarket parts and accessories for motorcycles, including lighting, covers, trims, and accents, accessory mounts,

controls, grips, mirrors, and pegs, touring and comfort products, windshields and air management products, and performance products (*e.g.*, exhausts, mufflers, and air cleaners).

6.     There are several brands and trademarked product lines of Kuryakyn-designed parts and accessories, including Kuryakyn®, Crusher®, Bahn®, and Xkursion®.

7.     These parts and accessories fit on motorcycles sold by Harley-Davidson, Honda, Victory, and others.

8.     Kuryakyn has designed logos for some of its products.

9.     An example of a logo that Kuryakyn designed is "Wild Things," shown below:



10.     Ken Madden designed the Wild Things logo in the scope of his employment as a Kuryakyn designer.  Kuryakyn owns the Wild Things logo and trademark.

11.     Kuryakyn is primarily a design company.  It relies on staff and outside partners to create product designs for parts and accessories based on ideas that they generate themselves, or are based on ideas gathered from customers and market research.

12.     Kuryakyn does not have a manufacturing facility.  It relies on suppliers to make both the tooling and the part or accessory according to Kuryakyn's designs and specifications.

13.     In addition to Kuryakyn, MAG owns several other companies that are involved in the Powersports industry.

14.     Kuryakyn's business has grown since MAG acquired it in 2001.

2

15.     The Kuryakyn catalog includes more than 3,000 different parts and accessories that are sold throughout the United States and worldwide, including in Canada, Europe, Japan, Australia, Mexico, and Russia.

16.     Prior to joining MAG in May 2012, I was President and CEO of a motorcycle aftermarket products distributor called Custom Chrome.  I resigned from Custom Chrome in November 2011 to spend time with my family.  At the time of my resignation from Custom Chrome, I received a call from Arnie Ackerman, MAG's Chairman, and Brian Etter, MAG's President and CEO at the time, about my potentially joining MAG.  Mr. Ackerman and Mr. Etter informed me that MAG planned to replace the presidents of two of its subsidiary companies, Kuryakyn and Vance & Hines, due to the succession needs of those companies.  Ultimately, MAG and I decided that Kuryakyn would be a better fit for me.

17.     I am aware that, in the Spring of 2013, MAG told Tom Rudd ("Rudd"), Kuryakyn's then-President, about MAG's decision to transition him from his position as President.  MAG and Rudd had multiple communications about MAG's decision throughout 2013.

18.     In or around July 2013, Kuryakyn and MAG began preparing Kuryakyn's 2013 Strategic Plan. I was made aware of the Plan because I was going to replace Rudd as Kuryakyn's President later that year.  A copy of the final 2013 Strategic Plan is attached as Exhibit A (KURYAKYN00003944-4027).

19.     In late August of 2013, I attended a meeting of MAG and Kuryakyn executives to discuss Kuryakyn's 2013 Strategic Plan.  Kuryakyn's senior management, as well as MAG senior management, including Mr. Ackerman and Mr. Etter, were present at the meeting.

3

20.     One of Kuryakyn's Strategic Initiatives under the 2013 Strategic Plan was for Kuryakyn to gain a leadership position for exhaust, which Kuryakyn viewed as a growth Opportunity.

21.     Another of Kuryakyn's Strategic Initiatives under the 2013 Strategic Plan was for Kuryakyn to gain a leadership position for aftermarket products in the UTV segment, which Kuryakyn also viewed as a growth Opportunity.

22.     Another of Kuryakyn's 2013 Strategic Initiatives was to develop a succession plan because the retirement of Kuryakyn's top management was eminent.

23.     In or around November 2013, MAG informed Rudd that I would be replacing him as Kuryakyn's President.  On December 19, 2013, MAG informed Rudd that it was time to implement the succession plan to transition Rudd as President of Kuryakyn.  At that time, MAG offered to make Rudd the Chairman of Kuryakyn after he stepped down as President.

24.     On December 19, 2013, Rudd accepted the offer to be Chairman of Kuryakyn, which became effective January 6, 2014.

25.     According to company records, on or around December 27, 2013, Rudd accessed his tom@kuryakyn.com business email account and forwarded various emails and business documents to his tomatkuryakyn@gmail.com personal email address.  He accessed his tom@kuryakyn.com business email account and forwarded additional business documents to his tomatkuryakyn@gmail.com personal email address.  These materials were commercially valuable to Kuryakyn and meant to be kept confidential. Rudd would have had no use for these materials in his new role as Chairman of Kuryakyn.

26.     In early February 2014, shortly after I became Kuryakyn's President, I inquired about a megaphone muffler design project that had been started at Kuryakyn in the Fall of 2013. At that time, I learned that Rudd had cancelled the megaphone muffler project. Company documents show that Rudd cancelled the project on your around December 27, 2013. A copy of a spreadsheet reflecting the status of Kuryakyn's megaphone muffler project is attached as Exhibit B (KURYAKYN00096795).

27.     My investigation of the muffler issue with MAG revealed that Rudd purchased the design drawings and prototype that Kuryakyn's R&D staff prepared for the megaphone muffler project from Kuryakyn after he canceled the project, without permission to do so.

28.     After this discovery, MAG and Kuryakyn asked Rudd to return the megaphone muffler design drawing and prototype. Rudd gave them back in return for the $3,500 that he had paid Kuryakyn to purchase them. The design drawings were returned to Kuryakyn in February or March of 2014.

29.     On May 9, 2014, Ken Madden ("Madden"), a designer for Kuryakyn of motorcycle parts and accessories, resigned without notice.

30.     I then offered to promote Darron May ("May"), another Kuryakyn designer of motorcycle parts and accessories, to a design manager positon on May 13, 2014. The promotion also came with a substantial raise.

31.     Although May initially accepted the promotion and raise, he resigned from Kuryakyn on May 23, 2014.

32.     On May 27, 2014, Christopher Lindloff ("Lindloff") resigned without notice.

33.     I reviewed Kuryakyn's business records, and they show that Kuryakyn paid Madden, May, and Lindloff their salaries and provided them with employee benefits continuously from January 1, 2013, through the dates of their respective resignations.

34.     Ciro is the only design company competing with Kuryakyn across several motorcycle aftermarket product categories.

35.     Kuryakyn creates and maintains financial and marketing information about its products, including costs, sales prices, margins, and demand and market research about consumers' likes and dislikes and Kuryakyn's most popular products.  Kuryakyn uses this information to guide its product development decisions.  This information is not generally available to the public and is commercially valuable to Kuryakyn.  Kuryakyn takes steps to maintain the confidentiality of this information.

36.     Without the right supplier for a particular product, it would be impossible for Kuryakyn to compete in the market.

37.     Kuryakyn's normal business hours are Monday through Friday, from 8:00 a.m. until 5:00 p.m.


I declare under penalty of perjury pursuant to 17 U.S.C. § 1746 that the foregoing is true and correct.

Holger Mohr

Somerset, Wisconsin
December _13_, 2016

6