IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KURYAKYN HOLDINGS, LLC,

               Plaintiff,

    v.                                        OPINION & ORDER

CIRO, LLC, THOMAS RUDD, DARRON MAY,          15-cv-703-jdp
KEN MADDEN, and CHRISTOPHER LINDLOFF,

               Defendants.

---

After more than 25 years as the founder and president of plaintiff Kuryakyn Holdings, LLC, a motorcycle aftermarket parts design company, defendant Thomas Rudd resigned. Rather than simply retiring, Rudd helped his son start a competing motorcycle aftermarket parts company, defendant Ciro, LLC, and poach Kuryakyn's three main designers, defendants Darron May, Ken Madden, and Christopher Lindloff. Kuryakyn, displeased with the sudden loss of its designers and the simultaneous entrance of a new competitor on the market, brought suit against defendants, alleging that the individual defendants used Kuryakyn's trade secrets and other resources to benefit Ciro and that some of their actions occurred while they were still collecting a salary from Kuryakyn.

Kuryakyn's 18 claims are gradually being whittled down: Kuryakyn has already voluntarily dismissed one claim, and now moves to dismiss an additional nine. Dkt. 102. The eight active claims that remain are the subject of defendants' motion for summary judgment. Dkt. 69. The court will grant summary judgment in favor of defendants on seven of those claims. One claim will remain for trial: whether Rudd breached his fiduciary duty to Kuryakyn.

PRELIMINARY MATTERS

Before turning to defendants' summary judgment motion, the court must address Kuryakyn's motion to amend its complaint to dismiss counts II, V, IX, XI, XII, XIII, XV, XVI, and XVII with prejudice and assert new factual allegations in support of its copyright infringement claim. Although Kuryakyn did not file this motion until after defendants moved for summary judgment, defendants do not object to Kuryakyn's proposed amendments, so the court will grant Kuryakyn's motion. The court will direct defendants' summary judgment motion to the second amended complaint. Dkt. 102-1.

Defendants ask that the court order Kuryakyn to pay a portion of their accrued attorney fees and costs as a condition of dismissing its claims, contending that they are entitled to indemnification by Kuryakyn under Delaware law. The court declines to assess fees and costs against Kuryakyn at this stage of litigation, but defendants may renew their request in a formal motion when the court determines damages, attorney fees, and costs.

The court notes that Kuryakyn's second amended complaint includes a claim under Wis. Stat. § 100.18 for unfair trade practices, Count III, even though the court already dismissed this claim with prejudice. *See* Dkt. 51. The court will reaffirm that Count III has been dismissed with prejudice.

Thus, Kuryakyn's second amended complaint contains the following active claims:

| | |
|---|---|
| Count I | Copyright infringement against Ciro |
| Count IV | State law trade secret misappropriation against all defendants |
| Count VI | Breach of contract against Madden |
| Count VII | Breach of contract against May |
| Count VIII | Breach of contract against Lindloff |

| | |
|---|---|
| Count X | Breach of fiduciary duty and duty of loyalty against Rudd |
| Count XIV | Conspiracy to injure business against all defendants |
| Count XVIII | Federal law trade secret misappropriation against all defendants |

## UNDISPUTED FACTS

The following facts are undisputed, except where noted.

In the 1980s, defendant Thomas Rudd founded Kuryakyn Holdings, Inc., a motorcycle aftermarket parts design company. In 2001, Rudd sold Kuryakyn to Motorsport Aftermarket Group, Inc. (MAG). MAG converted Kuryakyn Holdings, Inc., into Kuryakyn Holdings, LLC, a Delaware limited liability company. Kuryakyn remained in the business of designing and selling aftermarket motorcycle parts, and Rudd stayed on as Kuryakyn's president.

Defendants Darron May, Ken Madden, and Christopher Lindloff all worked for Kuryakyn as designers. They each entered into a written employee agreement with Kuryakyn.

In 2012, MAG and Kuryakyn explored the possibility of acquiring Klock Werks, another company that designs motorcycle parts. Rudd helped negotiate the acquisition, but the deal fell through. Afterwards, Rudd told MAG that he wanted to buy Klock Werks for his son, Aero Rudd. (For clarity, the court will refer to Thomas Rudd as "Rudd" and to his son as "Aero.") Rudd floated the idea of a business arrangement between MAG and Klock Werks under Aero's leadership. The parties dispute whether MAG rejected this idea or simply never accepted it. Rudd directed two Kuryakyn employees, Thomas Ellsworth and Bob Hinton, to

work on the Klock Werks acquisition during business hours. But the deal fell through a few months later.

Later that year, Rudd began exploring other options for expanding Kuryakyn with DragonFire, another company owned by MAG. MAG asked Rudd to work with DragonFire to expand DragonFire's utility terrain vehicle (UTV) business and Kuryakyn's UTV aftermarket parts business. Rudd asked MAG to sell DragonFire to Aero. MAG neither rejected nor accepted the proposal, but directed Rudd to continue to explore the expansion of DragonFire's UTV business. Rudd then asked MAG to fund a new UTV company run by Aero under the MAG umbrella. MAG refused. Rudd suggested to MAG that Aero become a DragonFire distributor. MAG never rejected or accepted this proposal, either.

Meanwhile, Rudd and Aero were moving forward with plans to create a new UTV business. In April 2013, they met with Madden to discuss designing a snake logo for a new UTV brand. Madden emailed Rudd a "snake with tongue" design and met with Rudd at 5:00 p.m., after close of business, to discuss the design further.



Rudd liked the design and asked Ellsworth to see if "Venom" was available as a UTV company name under the MAG umbrella. Ellsworth oversaw trademark research on "Venom" at Kuryakyn's expense and eventually concluded that the name was unavailable. Rudd and Aero contemplated other ideas and eventually settled on "Ciro." Once again, Ellsworth

oversaw trademark research at Kuryakyn's expense, which indicated that Ciro was available as a brand of UTV accessories and apparel. The parties dispute what "Ciro" was intended to represent at this point: Kuryakyn argues that Aero intended Ciro to be a UTV parts brand associated with Kuryakyn; defendants argue that Aero did not know exactly what Ciro would be, but hoped that it could be a DragonFire distributor for UTV parts. In July 2013, Rudd emailed Madden:

> The name of Aero's new company is CIRO. Sure would appreciate it if you could now finalize the logo with Ciro in the mouth of the snake by early next week.

Dkt. 104-33, at 2. Madden responded the next week, sending Rudd a "white snake" design (below) and two variations on this design, one with a black background and one with a tongue.



Madden created these designs on his personal laptop using a program that he obtained from Kuryakyn. *See* Dkt. 97 (Madden Dep. 98:21-101:14). Rudd wrote Madden a check for $500 to pay for his work in creating the designs.[1] Aero reimbursed Rudd. Aero later wore a shirt embroidered with the white snake design at Kuryakyn's vendor stall at the August 2013

---

[1] Kuryakyn tries to dispute this, arguing that Rudd's check to Madden "does not indicate what the payment was for." Dkt. 147, ¶ 38. But Kuryakyn offers no alternative version of the facts, whereas defendants adduce Aero's deposition testimony, Madden's declaration, and Rudd's declaration in support of their contention that the payment was for the design. The court will therefore accept defendants' proposed fact as not genuinely disputed.

Sturgis Rally while displaying a UTV outfitted with DragonFire parts and distributing DragonFire marketing materials. Aero collected customer feedback about DragonFire at Sturgis, which Rudd forwarded to MAG. MAG continued to explore the expansion of DragonFire's UTV business. Rudd forwarded internal emails among MAG, DragonFire, and Kuryakyn and confidential business information regarding the UTV market to Rudd's personal email account,[2] as well as to Aero and to Rudd's wife, Pat Furlong.

By November 2013, Rudd had given up on the DragonFire/Kuryakyn UTV project. But he hadn't given up on Ciro. He and Furlong hired attorneys to form a limited liability company named "Ciro."

In December 2013, MAG forced Rudd to resign as president of Kuryakyn. MAG appointed Holger Mohr as president and offered Rudd the position of chairman. Rudd accepted MAG's offer of the chairman position on December 19, 2013. On December 27, 2013, and January 2, 2014, Rudd forwarded various emails and business documents from his business email account to his personal one. He also told Kuryakyn employees to pause the "megaphone muffler" design project, which he had instructed them to begin a few months earlier. He then bought the design drawings for the megaphone muffler project from Kuryakyn. The parties dispute whether Rudd was authorized to buy the designs. Kuryakyn later reimbursed Rudd for the designs and took them back. On January 7, 2014, Rudd told MAG that he was taking a vacation.

---

[2] The parties dispute whether tomatkuyrakyn@gmail.com was Rudd's personal email account or simply another business account that he used at home because he could only access his tom@kuryakyn.com email account at Kuryakyn's office. But this fact is immaterial, so the court need not resolve the dispute and will refer to tomatkuryakyn@gmail.com as Rudd's personal email account.

Soon after, Rudd asked Madden, Lindloff, and May, Kuryakyn's only designers, out to dinner. Aero attended, as well. At the dinner, Aero asked the three designers to work for his new company, Ciro. Madden decided within a few days to quit Kuryakyn and join Ciro. Rudd resigned from Kuryakyn on February 3, 2014. The parties dispute when Lindloff and May decided to join Ciro. By the end of February, Rudd was representing to others that Ciro would employ three designers, although Lindloff and May testified that they had not committed to leaving Kuryakyn for Ciro until May 2014. But even if they had not decided to join Ciro, they attended several more dinners with Rudd, Aero, and Madden between February and May at which they discussed plans for Ciro.

Ellsworth resigned from Kuryakyn on April 29 and began consulting for Ciro in May. Madden resigned from Kuryakyn on May 9, 2014. May followed him on May 23. Lindloff resigned on May 27, leaving Kuryakyn with only one product designer, who had begun working at Kuryakyn only the month before. Madden, May, and Lindloff all signed employment agreements with Ciro on May 27.

In fall 2014, Madden updated the 2013 white snake design to create the current version of the Ciro logo, shown below. Ciro currently uses the 2014 Ciro logo in its business, although it had used the 2013 version at some point.



Ciro began selling aftermarket motorcycle parts at the Sturgis Rally in August 2015. The parties dispute whether several of Ciro's products, including a megaphone muffler, tappet covers, cylinder base covers, and handlebar covers, incorporate Kuryakyn's trade secrets.

Kuryakyn registered the copyright to the 2014 Ciro logo in its own name on September 11, 2015, before filing this lawsuit on November 2, 2015. It registered the snake with tongue design, the white snake design, and the black snake design as its own copyrights on November 18, 2016. It indicated on its copyright registration applications that these were works made for hire.

The court has jurisdiction over Kuryakyn's claims arising under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. 1836, under 28 U.S.C. § 1331, because those claims raise federal questions. The court has supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367.

ANALYSIS

Defendants move for summary judgment on Kuryakyn's eight remaining claims. Summary judgment is appropriate if the moving party "shows that there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996).

## A. Breach of contract

Kuryakyn claims that Madden, May, and Lindloff breached their employment agreements with Kuryakyn in various ways by using Kuryakyn's resources to benefit Ciro. But, as the court will discuss below, Kuryakyn has dismissed or waived all of its breach of contract claims, so the court will grant summary judgment on these claims in defendants' favor.

The court begins with the claims arising under Sections 2 and 3 of the employment agreement. In its now-operative second amended complaint, Kuryakyn claims that Madden, May, and Lindloff each breached obligations arising under Section 2 of their employment agreements with Kuryakyn by failing to maintain the confidentiality of Kuryakyn's trade secrets and other proprietary information. *See* Dkt. 102-1, ¶¶ 190, 201, 208. Kuryakyn also claims under Section 3 that Madden breached obligations by failing to disclose or assign to Kuryakyn his copyright in the Ciro logo. *See id.* ¶¶ 193, 194. In response to defendants' motion for summary judgment, Dkt. 128, at 52, Kuryakyn states that these breach of contract claims "are no longer at issue" as a result of Kuryakyn's motion for leave to file a

second amended complaint, Dkt. 102, in which Kuryakyn voluntarily dismissed nine of its claims with prejudice. Kuryakyn did not expressly dismiss its breach of contract claims in its motion for leave to file a second amended complaint, but because it now indicates that it does not wish to prosecute these claims and has not defended against defendants' motion for summary judgment on these claims, the court will grant summary judgment in defendants' favor on these claims under Sections 2 and 3 of the employment agreement.

That leaves Section 1. Kuryakyn maintains that it has outstanding breach of contract claims against Madden, May, and Lindloff under Section 1 of their employment agreements, which requires employees to "devote full time and attention to their duties at Kuryakyn." Dkt. 128, at 52. But Kuryakyn's second amended complaint contains no allegations concerning Section 1. *See* Dkt. 102-1. Nor does Kuryakyn's first amended complaint, *see* Dkt. 63, or its initial complaint. *See* Dkt. 1. Kuryakyn did not provide notice in any version of its complaint of claims under Section 1, so it has waived these claims. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012). Kuryakyn argues that it provided notice of these claims in its answers to defendants' interrogatories, but this simply does not matter: the complaint is the operative pleading that alerts defendants of the allegations against them, and notice of claims must be provided in the complaint. Kuryakyn could have moved to amend its complaint to include claims under Section 1, but it did not. It cannot amend its complaint through answers to interrogatories or a response to a motion for summary judgment. *See id.* Kuryakyn has waived any claims, including those under Section 1 of Madden's, May's, and Lindloff's employment agreements, not stated in its second amended complaint. Thus, the court will grant summary judgment to defendants on all of Kuryakyn's breach of contract claims.

10

**B.  Trade secret misappropriation**

Kuryakyn claims defendants misappropriated its trade secrets in violation of Wisconsin's Uniform Trade Secrets Act (UTSA), Wis. Stat. § 134.90, and the federal Defend Trade Secrets Act of 2016 (DTSA), 18 U.S.C. § 1836. The DTSA gives rise to a federal cause of action, but the parties agree that substantively the UTSA and DTSA are "essentially the same," Dkt. 128, at 33 and Dkt. 144, at 5, and that courts may look to the state UTSA when interpreting the DTSA. *See, e.g., Earthbound Corp. v. MiTek USA, Inc.*, 16-cv-1150, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016). Thus, the court's analysis will use Wisconsin's UTSA, but the analysis would apply as well to the DTSA.

The UTSA bars disclosing or using without consent a trade secret acquired through improper means. It defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1.  The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> 2.  The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c). Kuryakyn, as the party seeking protection under the UTSA, bears the burden of showing that the information at issue actually a trade secret, which requires showing that it "is valuable, not known to others who might profit by its use, and has been handled by means reasonably designed to maintain secrecy." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002); *see also Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis.*, 106 Wis. 2d 142, 146, 316 N.W.2d 120, 122 (Ct. App. 1981).

Kuryakyn claims the following as its trade secrets:

- Design drawings, specifications, and other engineering information for new products and anticipated changes to current Kuryakyn products.

- Techniques for the design and manufacture of Kuryakyn's products, including knowledge of computer hardware and software used in the design process and "the creation and use of fixtures designed to assemble . . . parts in a cost-effective way."

- Market research and information on consumer demand for new products and changes to current Kuryakyn products.

- "Cost structures, prices, and pricing strategies" of products.

- "Budgets, operating plans, strategic plans, and product and process plans and projections," including "[i]nformation about Kuryakyn's development of a smartphone app for controlling colored lights applied to motorcycles."

- Contact information for "[c]ustomers and purchasers of motorcycle parts and accessories."

- Contact information for and information of the manufacturing and production capabilities of five "[q]ualified suppliers of motorcycle parts and accessories."

- "[S]olicitations from potential suppliers and customers seeking to serve as distributors, as well as ideas for new products."

Dkt. 102-1, ¶ 69 and Dkt. 72-1, at 5-8. Defendants contend that none of the information listed in Kuryakyn's second amended complaint is a trade secret subject to the UTSA because it is publicly available and easily acquired by others. Defendants' criticism reveals a larger problem with Kuryakyn's claims: Kuryakyn offers vague, generalized descriptions of its purported trade secrets without demonstrating that any specific piece of information meets the statutory definition of trade secret. "[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting

the statutory definition." *IDX Sys.*, 285 F.3d at 584; *accord Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). Because Kuryakyn has not done so, the court will grant summary judgment in defendants' favor on its trade secret misappropriation claims.

Kuryakyn points to only one piece of evidence identifying "precisely what information it claims is a trade secret": its sworn interrogatory responses. Dkt. 128, at 34; *see* Dkt. 72-1, at 4-22. Kuryakyn did not incorporate its interrogatory responses in its statement of additional proposed findings of fact as the court requires. *See* Dkt. 43, at 8-11 ("If a responding party believes that more facts are necessary to tell its side of the story, it should include those facts in its own proposed facts . . . . The court will not search the record for evidence."). But even if Kuryakyn had properly offered this evidence in support of its claims, the interrogatory responses still do not "pin down" the trade secrets as required at the summary judgment stage.[3] *IDX Sys.*, 285 F.3d at 583. Kuryakyn's descriptions of its purported trade secrets are too vague. For example: "information about [the] manufacturing skill, reliability, resources, capacity, technological knowledge, costs of manufacture, component costs, and expertise specific to the development and production of motorcycle parts and accessories" of five specific suppliers. Dkt. 72-1, at 6. Such descriptions are like the "43-page description of the methods and processes underlying and the inter-relationships among various features making up IDX's software package" at issue in *IDX Systems*, which were held to be "too vague and too inclusive." *IDX Sys.*, 285 F.3d at 583. Descriptions such

---

[3] The interrogatory responses point to documents in "Schedule A" as identifying additional trade secrets. Dkt. 72-1, at 7. But the interrogatory responses include no attachments, and Kuryakyn has filed no document labeled "Schedule A" with the court. Defendants indicate that they never received an attachment identifying additional trade secrets. *See* Dkt. 144, at 6 n.1.

13

as "[i]nformation about Kuryakyn's development of a smartphone app for controlling colored lights applied to motorcycles," Dkt. 72-1, at 8, are marginally more specific, but still fail to identify what information, exactly, Kuryakyn claims is a trade secret. Is it simply the knowledge that Kuryakyn was developing a smartphone app, some bit of code within the smartphone app, or something in between? A few lines later, Kuryakyn lists the "concept and design" of its smartphone app as trade secrets, but still fails to "separate the trade secrets from the other information that goes into any software package." *IDX Sys.*, 285 F.3d at 584. Because Kuryakyn fails to pin down the purported trade secrets, the court cannot determine whether it meets the statutory elements for a trade secret.

Kuryakyn includes some "examples" in its interrogatory responses that arguably might be specific enough, such as knowledge of one supplier's "ability to polish and chrome motorcycle parts to meet Harley-Davidson's finishing requirements," Dkt. 72-1, at 6, but Kuryakyn fails to take the next required step, that is, to demonstrate that this specific information meets the statutory definition of a trade secret. Information about a third party that is readily ascertainable by simply asking the third party is not a trade secret. *See Share Corp. v. Momar Inc.*, No. 10-cv-109, 2011 WL 284273, at *9 (E.D. Wis. Jan. 26, 2011). Contrary to Kuryakyn's argument, information about the handful of suppliers that Kuryakyn used is not the equivalent of the 2,000-supplier database at issue in *Sigma Chemical Co. v. Harris*, 605 F. Supp. 1253, 1255, 1261-63 (E.D. Mo. 1985), *rev'd on other grounds*, 794 F.2d 371 (8th Cir. 1986). Kuryakyn has not demonstrated that its supplier information is not readily ascertainable.

The same is true of Kuryakyn's product designs. Although Kuryakyn may have identified some individual product designs with enough specificity, it has not shown that

14

those designs are trade secrets. Defendants contend that these designs are readily ascertainable by purchasing the products and reverse engineering them, as Kuryakyn's vice president of product development admitted during a deposition. *See* Dkt. 83 (Amenda Dep. 64:17-19 ("[Y]ou could possibly reverse engineer your way back into [the design of Kuryakyn's air cleaner], but if you knew it, it would be much faster to get to market.")). "[I]t is perfectly lawful to 'steal' a firm's trade secret by reverse engineering." *ConFold Pac., Inc. v. Polaris Indust., Inc.*, 433 F.3d 952, 959 (7th Cir. 2006). Kuryakyn fails to rebut defendants' contention that its designs may be reverse engineered, so it has not met its burden of showing its product designs are trade secrets. *See Maxpower Corp. v. Abraham*, 557 F. Supp. 2d 955, 961 (W.D. Wis. 2008) (denying the plaintiffs' motion for preliminary injunction because "they failed to rebut defendants' evidence that much of the alleged trade secret information is common knowledge in the industry or easily ascertainable [and] failed to show that they took reasonable measures to protect the confidentiality of the information").

Many plaintiffs allege trade secret misappropriation, but few prove it. "[I]t is hard to prove that particular information qualifies as a trade secret." *IDX Sys. Corp.*, 285 F.3d at 584. To survive summary judgment, Kuryakyn must identify specific documents or information that constitute trade secrets, not simply list categories or general topics of information. *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-cv-1046, 2013 WL 6255689, at *6 (E.D. Wis. Dec. 4, 2013); *accord Composite Marine Propellers*, 962 F.2d at 1266. Kuryakyn has not done so, and, for that reason, the court will grant defendants' motion for summary judgment on Kuryakyn's trade secret misappropriation claims.

## C.  Breach of fiduciary duty

Kuryakyn claims that Rudd breached his fiduciary duties, including his duty of loyalty, to Kuryakyn. To prove a claim for breach of fiduciary duty under Delaware law, a plaintiff must show the existence of a fiduciary duty and a breach of that duty.[4] *See Wayman Fire Prot., Inc. v. Premium Fire & Sec., LLC*, No. 7866, 2014 WL 897223, at *20 (Del. Ch. 2014). Rudd does not dispute that he owed a fiduciary duty to Kuryakyn through February 2014, but he contends that he did not breach that duty because, at most, he helped prepare Ciro to compete with Kuryakyn in the future. Although it is true that "employees do enjoy a privilege allowing them to make preparations to compete with their employer before their employment relationship ends," that privilege does not extend to circumstances in which the employee misuses confidential information, conspires to effectuate mass resignation of key employees, or usurps a business opportunity of the employer. *Id.* Kuryakyn contends that Rudd breached his duty in four ways. Kuryakyn adduces sufficient evidence to stave off summary judgment as to two of these actions.

First, Kuryakyn contends that an officer or director may breach his duty of loyalty to his company by "diverting its resources for his own benefit." *TVI Corp. v. Gallagher*, No. 7798, 2013 WL 5809271, at *11 (Del. Ch. Oct. 28, 2013). Here, Rudd directed two Kuryakyn employees, Ellsworth and Hinton, to work to acquire Klock Werks for his son, Aero, during business hours. Rudd did so after the deal between MAG, Kuryakyn, and Klock Werks fell through. The parties dispute whether MAG rejected, or simply never accepted, the

---

[4] Kuryakyn argues that Delaware law governs its breach of fiduciary duty claim because under Wis. Stat. § 183.1001(1), courts must treat limited liability companies and their managers and members as governed by the law of the state in which the LLC is organized. *See Rual Trade Ltd. v. Viva Trade LLC*, 549 F. Supp. 2d 1067, 1077-78 (E.D. Wis. 2008). Defendants do not object to the application of Delaware law.

idea of a business arrangement between MAG and Klock Werks under Aero's leadership. But even if MAG did not explicitly reject the idea, a reasonable juror could conclude that Rudd breached his duty of loyalty to Kuryakyn by directing its employees to help his son acquire another company without Kuryakyn's approval of his proposed business arrangement.

Second, Kuryakyn points to Rudd's interaction with Kuryakyn's megaphone muffler project and argues that he usurped Kuryakyn's business opportunity. Rudd instructed Kuryakyn employees to design a "megaphone muffler" in September 2013. But in December, he instructed them to put the project on hold. Kuryakyn's incoming president, Holger Mohr, was unaware that Rudd paused the project. Rudd bought the design drawings from Kuryakyn, reimbursing Kuryakyn for the time spent on the project. Kuryakyn later undid that transaction, returning Rudd's money to him and taking the design drawings back. Ciro began selling a megaphone muffler in August 2015. Under Delaware law, "a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). Even drawing all reasonable inferences from the facts in Kuryakyn's favor, Kuryakyn still has not adduced evidence sufficient to allow a reasonable juror to find that Rudd's actions concerning the megaphone muffler project breached his fiduciary duties to Kuryakyn. Rudd did not hide the project from Kuryakyn; instead, he brought it to the company's attention. He later paused work on the project and attempted to buy it from Kuryakyn shortly before retiring, but in the end, Kuryakyn retained control and ownership of

17

the project. So although Ciro now sells a megaphone muffler that Kuryakyn contends is very similar to the one designed under Rudd's direction at Kuryakyn, Rudd did not prevent Kuryakyn from pursuing the same project itself. Kuryakyn has not adduced facts sufficient to show that Rudd usurped the megaphone muffler project from Kuryakyn.

Third, Kuryakyn contends that Rudd took Kuryakyn's confidential business information for his own use when he forwarded emails and business documents from his business email account to his personal email account, and to his son's and wife's email accounts. But even if the information contained within these emails and documents was confidential, Kuryakyn adduces no evidence that Rudd, his wife, or his son used or benefited from that specific information. Personal benefit or damage to the corporation is an element of every breach of fiduciary duty claim. *See Citron v. Merritt-Chapman & Scott Corp.*, 409 A.2d 607, 611 (Del. Ch. 1977). The cases that Kuryakyn cites for the proposition that these emails breached Rudd's duty of loyalty only confirm that evidence of financial harm or personal profit is a necessary element of this claim. *See Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to *profit personally* from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the fiduciary." (emphasis added)); *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949) ("Public policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation *to his own profit*, regardless of whether his employer suffers a loss." (emphasis added)). Rudd's taking of confidential information, without more, is not sufficient to sustain a claim for breach of fiduciary duty.

Finally, Kuryakyn contends that Rudd convinced Madden, May, and Lindloff to resign from Kuryakyn and join Ciro, leaving Kuryakyn without experienced designers, and

18

that Rudd failed to inform Kuryakyn of their impending departure. As mentioned, in January 2014, Rudd asked Madden, Lindloff, and May, Kuryakyn's only designers, out to dinner. At the dinner, Aero asked the three designers to work for his new company, Ciro. The parties dispute whether Rudd directly solicited the designers to join Ciro, but even the undisputed facts would allow a reasonable juror to find that Rudd "conspired to effectuate mass resignation of key employees," and therefore breached his fiduciary duty to Kuryakyn. *Wayman Fire*, 2014 WL 897223, at *20; *see also Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980)).

The court will grant in part, and deny in part, defendants' motion for summary judgment on Kuryakyn's breach of fiduciary duty claim.

One final note on the breach of fiduciary duty claims. Kuryakyn contends that "should the jury conclude that Tom Rudd breached his fiduciary duties to Kuryakyn, forfeiture of Rudd's salary would be an appropriate remedy for his abuses of trust." Dkt. 128, at 51. Under Delaware law, "corporation compensation is properly recoverable in a situation where the disloyalty of the officer or director constitutes the usurpation of a corporate opportunity." *Citron*, 409 A.2d at 611; *accord Borden v. Sinskey*, 530 F.2d 478, 497-98 (3d Cir. 1976). Defendants do not dispute this statement of the law or argue that its application should be limited to claims involving the usurpation of a business opportunity specifically. The court agrees that should Kuryakyn establish a breach of Rudd's fiduciary duty, Kuryakyn may recover Rudd's salary, or an appropriate portion of it, paid during the time he was actively breaching his fiduciary duties.

### D. Copyright infringement

Kuryakyn claims it owns the copyright to the Ciro logo because Madden designed it while working for Kuryakyn, and thus, Ciro's use of the logo is infringing.  To prove a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright and (2) copying of constituent components of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Here, the second element—copying—is not contested. Defendants challenge the first element—ownership of the copyright. Kuryakyn's copyright registrations are prima facie evidence of its ownership of valid copyrights. 17 U.S.C. § 410(c); *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) ("A certificate of registration from the U.S. Register of Copyrights constitutes *prima facie* evidence of the validity of a copyright."). This creates a rebuttable presumption: defendants can successfully defend the charge of infringement by showing that the copyright is invalid or that the facts stated in the certificate are untrue. *See Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). As the Seventh Circuit has explained, "the burden of proof in the sense of the risk of nonpersuasion . . . remains throughout the trial upon the party on whom it was originally cast." *Id.* (quoting Fed. R. Evid. 301). That burden is Kuryakyn's here.

The court begins with a preliminary matter. Defendants contend that Kuryakyn waived its copyright infringement claim because it initially alleged infringement of only the 2014 version of the Ciro logo, which Madden did not create until after resigning from Kuryakyn, and did not allege infringement of earlier versions of the Ciro logo until it filed its second amended complaint, which was too late to provide adequate notice to defendants. But the 2014 version of the Ciro logo is a derivative work based on earlier versions that Madden designed before resigning from Kuryakyn. Defendants are needlessly confusing a simple issue

that Kuryakyn has presented throughout the litigation: did Madden design a version of the Ciro logo within the scope of his employment with Kuryakyn? If he did, Ciro has infringed Kuryakyn's copyright. If he did not, Kuryakyn's infringement claim fails. Because Kuryakyn has not waived its claim regarding the Ciro logo, the court will address its merits.

Kuryakyn claims it owns copyright in Ciro's logo because the logo was designed by Madden within the scope of his employment and therefore is a work made for hire under the Copyright Act. *See* 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."). A work made for hire is created in one of two ways. First, any work "prepared by an employee within the scope of his or her employment" is a work made for hire. 17 U.S.C. § 101. Second, an independent contractor can create a work made for hire, if "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire," and the work is one of the types specified in the statute. *Id.* Kuryakyn does not contend that the second category applies.

There is no question that Madden was Kuryakyn's employee when he created the Ciro logo. Thus, the question is whether designing the Ciro logo was within the "scope of employment," a question decided under the common law principles of agency. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989). The Supreme Court cited Restatement (Second) of Agency § 228 (1958) as a source of these common law principles, *id.*, and so courts have followed the Restatement's approach when determining the scope of

employment. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1015 (9th Cir.

2012).  Section 228 states:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
>   (a) it is of the kind he is employed to perform;
>
>   (b) it occurs substantially within the authorized time and space limits; [and]
>
>   (c) it is actuated, at least in part, by a purpose to serve the master . . . .
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Although the language of § 228(1) suggests that a plaintiff must satisfy all three elements of

the test to show that the act in question was done within the scope of employment, § 228(2)

suggests that the test consists of three factors for courts to consider, none of which are

necessarily dispositive. Courts' application of the test confirms that the time-and-space

factor, at least, is not dispositive. *See Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir.

1994) (collecting cases). Here, the court need not decide which approach is correct, because

even if it conceives of § 228 as a list of factors to consider, the factors weigh in favor of

defendants. The parties agree that designing logos was the kind of work Kuryakyn employed

Madden to perform. But they dispute the time-and-space factor and the purpose factor. The

court will consider these two factors in turn.

The time-and-space factor weighs in favor of defendants. The parties agree that

Madden designed the Ciro logo on his laptop using software provided to him by Kuryakyn.

But the more telling issue is whether he did the work on company time. Kuryakyn points to

two chains of emails to support its contention that Madden designed the logo at Kuryakyn's office during regular business hours. The first email was sent from Madden's personal email address to his Kuryakyn email address at 10:30 p.m. on a Sunday night. It contains no text, only an attachment of the snake with tongue design. Madden then forwarded this attachment to Rudd's Kuryakyn email address at 1:30 p.m. on Monday, stating, "Here is a very rough BlackSnake concept. I have some drawings to show you as well. I will come up there at 5 to show you." Dkt. 104-24, at 2. Rudd then forwarded the email to Aero and Furlong. The parties agree that Kuryakyn's normal workday ended at 5:00 p.m. The second chain begins with an email from Rudd's personal email address to Madden's personal email address at 9:00 p.m., telling Madden that the name of the new company would be "Ciro" and asking him to finalize the logo by the next week. Madden responded just after midnight, attaching the white and black snake designs. Both chains of emails indicate that Madden worked on the logo outside of Kuryakyn's regular business hours, but had at least one meeting regarding the logo at Rudd's Kuryakyn office. Madden testified that he worked on the logo at home. Dkt. 148 (Arb. Tr. 3, at 1046:19-1047:5). No reasonable juror could conclude, based on this evidence, that Madden designed the Ciro logo within the time and space limits of his employment.

The purpose factor also weighs in favor of defendants. Although Madden designed the Ciro logo under Rudd's supervision, and Rudd was, at the time, Kuryakyn's president, these facts alone do not show that Madden created the logo to serve Kuryakyn. Defendants adduce evidence that Madden was paid separately for the design work and understood that the work was not for Kuryakyn. The fact that Rudd asked Ellsworth, a Kuryakyn employee, to perform trademark research on Ciro's name at Kuryakyn's expense raises a question about Rudd's

intentions for Ciro—did he intend Ciro to be his son's separate business or an offshoot of Kuryakyn?—but the focus of the third factor is on Madden's purpose in creating the logo, not Rudd's purpose. *See Martin v. City of Indianapolis*, 982 F. Supp. 625, 634 (S.D. Ind. 1997) (The "analysis must be directed, not at the alleged beneficial effect on [the employer], but at the motivation of [the employee]. The state of mind of the employee is the material determination; the court may consider the employee's actions or other manifestations only as evidence of the employee's state of mind."). Kuryakyn adduces no evidence indicating that Madden believed he was creating the logo for Kuryakyn, and defendants adduce some evidence that Madden understood that his design work was *not* for Kuryakyn. No reasonable juror could conclude that Madden was motivated by a desire to serve Kuryakyn when he designed the Ciro logo.

Therefore, no reasonable jury could find that Madden designed the Ciro logo within the scope of his employment with Kuryakyn, and, as a result, Kuryakyn does not own copyright in the logo, in any variation. The court will grant summary judgment in favor of defendants on the copyright infringement claim.

## E. Conspiracy to injure business

Kuryakyn claims that defendants violated Wis. Stat. § 134.01, which "prohibits conspiracies between two or more people to willfully or maliciously injure the reputation, trade, business or profession of another." *Virnich v. Vorwald*, 664 F.3d 206, 209 (7th Cir. 2012). Section 134.01 "is a criminal statute, but Wisconsin courts have found an implied private right for victims of such conspiracies." *Id.* at 212. To prove a claim under § 134.01, a plaintiff must show that "(1) the defendants acted together; (2) with a common purpose to

injure the plaintiff's reputation or business; (3) with malice; and (4) the plaintiff suffered financial harm." *Id.* at 213.

Defendants' briefing is sparse, but they contend generally that Kuryakyn fails "to present an issue of genuine material fact with respect to" its conspiracy claim. Dkt. 70, at 43. Kuryakyn bears the burden here. So, in response, Kuryakyn should have pointed to evidence that would establish each of the elements of its § 134.01 claim. But it did not. There is ample evidence in the record to support a finding that defendants acted together and that their actions resulted in harm to Kuryakyn. However, Kuryakyn has adduced no evidence that defendants acted with *malice*. "The malice that must be pled to satisfy section 134.01, by definition, must not be based on the defendant's intent to gain a competitive advantage. . . . The plaintiff must allege and then prove an irrational desire to harm for harm's sake." *Virnich*, 664 F.3d at 214; *accord Aikens v. Wisconsin*, 195 U.S. 194, 203 (1904) (interpreting malice under the Wisconsin statute as "doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired"). The evidence adduced by Kuryakyn in support of its other claims shows that defendants were motivated by a desire to promote their own business interests and gain a competitive advantage over Kuryakyn. This makes it impossible to find that defendants acted with the requisite malice. The court will grant summary judgment in favor of defendants on Kuryakyn's conspiracy claim under § 134.01.

In sum, defendants are entitled to summary judgment on all claims except Kuryakyn's breach of fiduciary duty claim against Rudd, which will remain for trial.

ORDER

IT IS ORDERED that:

1.  Plaintiff Kuryakyn Holdings, LLC's motion for leave to file a second amended complaint, Dkt. 102, is GRANTED. Counts II, V, IX, XI, XII, XIII, XV, XVI, and XVII are dismissed with prejudice.

2.  Defendants Ciro, LLC, Thomas Rudd, Darron May, Ken Madden, and Christopher Lindloff's motion for summary judgment, Dkt. 69, is GRANTED as to counts I, IV, VI, VII, VIII, XIV, and XVIII and DENIED as to count X, consistent with the foregoing.

Entered March 15, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge